908 So.2d 623 (2005)
WORLD TRADE CENTER TAXING DISTRICT
v.
ALL TAXPAYERS, PROPERTY OWNERS, and Citizens of World Trade Center Taxing District and Nonresidents Owning Property or Subject to Taxation therein, et al.
No. 2005-CA-0374.
Supreme Court of Louisiana.
June 29, 2005.
Dissenting Opinion August 25, 2005.
*625 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, Fred Lee Chevalier, Baton Rouge, Raedtha A. Vasquez, Elkins, PLC, Gary J. Elkins, Richard Louis Traina, Jordan Barro Monsour, Herman, Herman, Katz & Cotlar, Russ Michael Herman, Steven J. Lane, Soren Krik Gisleson, Sher Garner Cahill Richtier Klein McAlister & Hilbert, LLC, Timothy Benedict Francis, James Michael Garner, Joshua Simon Force, Kenneth M. Carter, *626 PLC, Kenneth M. Carter, New Orleans, counsel for appellant.
Bryan & Jupiter, Clare Frances Jupiter, New Orleans, Ward & Condrey, LLC, Joseph R. Ward, Jr., Covington, Liskow & Lewis, New Orleans, George Denegre, Jr., Robert S. Angelico, Cheryl Mollere Kornick, Kenneth Todd Wallace, Roedel, Parson, Koch, Blache, Balhoff & McCollister, Larry Michael Roedel, Brent Joseph Bourgeois, Baton Rouge, counsel for appellee.
Dissenting Opinion of Justice Johnson, August 25, 2005.
KNOLL, Justice.[*]
In this case we are called upon to decide whether an act of the legislature is a valid exercise of the legislature's plenary power. The act in question creates a political subdivision/taxing district within the city of New Orleans, granting to that district's board the authority to levy and collect a hotel occupancy tax within the district, in lieu of any other hotel occupancy tax, and further allows the district to pledge these taxes to secure revenue bonds issued by the district or to secure private financing of the district's projects. This necessarily involves a determination of whether this act is an exemption from the Orleans Parish hotel occupancy taxes, or a suspension of the laws imposing those taxes. This case is before us pursuant to our appellate jurisdiction, La. Const. art. V, § 5(D), because the court of appeal held the act unconstitutional. World Trade Ctr. Taxing Dist. v. All Taxpayers, et al., 05-0048 (La.App. 4 Cir. 2/1/05), 894 So.2d 1185, (hereinafter World Trade Ctr. III). For the following reasons, we find the court of appeal reached the right result and affirm, finding the statute at issue is a constitutionally prohibited exemption from taxes securing bonds and the offending portion of the statute is not severable from the remaining portion of the statute.

FACTS AND PROCEDURAL HISTORY
The city of New Orleans owns property located at the foot of Canal Street. In 1963, the city leased the property to the World Trade Center of New Orleans, Inc., (WTCNO) for a term of fifty-six years, ending in 2019. The WTCNO built the World Trade Center building on this land. The WTCNO is a non-profit organization that promotes international trade and economic development.
In 1994, WTCNO recommended that a portion of the 33 story WTC Tower should be converted into a hotel. This recommendation came about because of the downturn in the economy beginning in the 1980's, which resulted in significant unoccupied space in the WTC Tower. In 1998, after a bid process, WTCNO selected WTC Development as the hotel developer. At the time, no public financing was considered for the proposed development. The New Orleans City Council approved a new lease of the property to WTCNO for ninety-nine years. The City Council also approved a sublease of the first eighteen floors, the thirty-first floor and other property exclusively to the developer for ninety-nine years.[1] Also in 2001, WTC Development lost the proposed hotel operator identified in its original bid and lost its private financing.
Subsequently, the legislature enacted Acts 2002, 1st Ex.Sess., No. 47, relative to cooperative economic development, to create the World Trade Center Taxing District *627 and the Capitol House Taxing District as special taxing and tax increment financing ("TIF") districts in the parishes of Orleans and East Baton Rouge, respectively; to authorize the creation of a special taxing and tax increment financing district for the benefit of a hotel in the city of Alexandria; to provide for the boundaries and the governance of the districts; to provide for the authority, powers, duties and function of the governing body to levy and collect a tax upon hotel occupancy within the districts and to engage in tax increment financing; and to provide for related matters.
Louisiana Revised Statute 33:9038.21 A[2] provides for the creation of the World Trade Center Taxing District ("District"), a special taxing district and political subdivision of the state. The district is created to provide for cooperative economic development between the city of New Orleans, the World Trade Center, the District and WTC Development LTD. ("WTC Development"), to provide for the renovation, restoration and development of the city owned property known as the World Trade Center, and to implement the lease between the WTCNO and WTC Development. See La.Rev.Stat. 33:9038.21 C. The District contains the WTC Tower, a parking garage and specified adjacent land.
The enactment of Acts 2002, 1st Ex. Sess., No. 47, provided that the District could issue revenue bonds to finance or refinance any projects consistent with the purposes of the District. See La.Rev.Stat. 33:9038.21 G. Additionally, the District could pledge the taxes collected under its authority to any financing of the WTC property in furtherance of the purposes of the district. See La.Rev.Stat. 33:9038.21 G(2).
The District filed a motion for judgment on February 17, 2004, asking the District Court to approve, inter alia, a Cooperative Endeavor Agreement between the District and WTC Development, a Collection Agreement with the city of New Orleans, a Pledge Agreement whereby the proceeds of the tax levied and collected by the District would be pledged to secure the financing by WTC Development of a portion of the project, and the validity and legality of La.Rev.Stat. 33:9038.21. This petition was filed pursuant to the procedure outlined in the Bond Validation Statutes, La.Rev.Stat. 13:5121 et seq., pursuant to La.Rev.Stat. 33:9031.1.[3] WTC Development filed an answer to the motion for judgment, supporting the motion and praying for judgment as prayed for by the District.
*628 After publication as required by La.Rev. Stat. 13:5124, the motion was heard on March 5, 2004. A judgment was rendered on March 15, ordering judgment in favor of plaintiffs as prayed for. On March 19, the Greater New Orleans Hotel and Lodging Association ("Hotel Association") filed a motion to intervene as defendants, with an accompanying motion for expedited hearing. Ronnie J. Theriot also filed a motion to intervene and motion for new trial on March 22. The WTCNO joined the District and WTC Development in opposing the Intervenors. After numerous filings, a limited new trial and writs to the court of appeal, a full new trial on the merits was heard on December 2 and December 9, 2004.[4]
The trial court rendered judgment in favor of the District, WTC Development and WTCNO (collectively referred to as WTC entities) declaring the validity, legality, and effectiveness of the Cooperative Endeavor Agreement and of Act No. 47 of the First Extraordinary Session of 2002, the Ordinance of the District levying the tax, the lease between WTCNO and WTC Development, the Pledge Agreement between the District and WTC Development, and the pledge and collateral assignment of the tax proceeds to WTC Development by the District. In accordance with the provisions of the Bond Validation Statutes, this decree was declared forever binding and conclusive. The trial court rejected the Intervenors' argument that La.Rev. Stat. 33:9038.21 (WTC TIF statute) was unconstitutional. The court held the constitution permits the Legislature to create special districts, La. Const. art. VI, § 19; special districts, as political subdivisions, may engage in cooperative endeavors with any public or private association, corporation or individual, for a public purpose, La. Const. art. VII, § 14(C); and, the WTC TIF statute did not violate La. Const. art. VI, § 29(D) because the statute did not establish an exemption of any hotel occupancy taxes within the District, because no taxes are currently being collected within the District. The court alternatively found Article VI, § 29(D)'s limitation did not apply because the WTC TIF statute simply suspends the existing hotel occupancy taxes during the period of the statute and does not constitute a non-uniform exemption. As for the contention that the WTC TIF statute violated La. Const. art. VII, § 14(A), the court held the statute falls within the exceptions set forth in § 14(B)(1) and (3). Finally, the trial court held the intervenors lacked standing to challenge the Cooperative Endeavor Agreement, the lease between WTC Development and WTCNO, the ordinance adopted by the District levying a hotel occupancy tax in the district and/or the WTC TIF statute.
The court of appeal reversed. It held the WTC TIF statute unconstitutional as a special law in violation of La. Const. art. III, § 12(A)(7); further, the court of appeal found the statute was unconstitutional because it creates an exemption from the hotel occupancy tax where certain proceeds of the tax presently secure outstanding bonds and, additionally, the exemption is not uniform, in violation of La. Const. art. VI, § 29(D); and, the WTC TIF statute is prohibited under La. Const. art. VII, § 14(A). World Trade Ctr. III, 05-0048 at pp. 5-6, 8, 13, 894 So.2d at 1190-1192, 1194. This matter is now before us under our appellate jurisdiction.

*629 DISCUSSION

Interested Persons
As a preliminary matter, we must first address the WTC Entities' argument that the Intervenors failed to prove they had standing as "interested persons" to challenge the statute. The trial court ruled that because the Intervenors did not introduce any evidence establishing that the Hotel Association, any of its members and/or Mr. Theriot were taxpayers, property owners or citizens of the District, nor any evidence establishing they had any right, title or interest in any property or funds to be affected in any way by the issuance of the bonds, and/or did not introduce any evidence the WTC TIF statute would affect or harm the Intervenors, or any of their interests in any respect, they lacked standing pursuant to La.Rev.Stat. 13:5124 A(2).
The court of appeal found the trial court erred in sustaining the exception of no right of action. The court stated it had disposed of this issue previously in World Trade Ctr. I, 04-0572, which came before the court pursuant to a supervisory writ filed by the District in response to the trial court's judgment that allowed the Hotel Association and Mr. Theriot to intervene. There the court noted "[r]elator does not dispute that the Hotel Association and Theriot are interested persons as provided by La. R.S. 13:5126." World Trade Ctr. I, at p. 2, 875 So.2d at 852. Further, in World Trade Ctr. II, the court stated:
This Court based its decision [in World Trade Ctr. I, finding no abuse of the trial court's discretion in granting leave to intervene] on the fact that La. R.S. 13:5121, et seq., was controlling, and La. R.S. 13:5126 specifically provided "[a]ny property owner, taxpayer, citizen or other person in interest may become a party to said proceedings by pleading to the motion within seven days after the second publication thereof, or thereafter by intervention upon leave of court. . . ." The [World Trade Ctr. I] Court reasoned that "[g]iven the expedited nature of the validation procedure, the legislatively expressed intent to provide an equitable process with regard for the public fisc and rights of interested parties, plus the procedural exclusivity language in La. R.S. 13:5122, it appears that the legislature implemented La. R.S. 13:5126 to vest the trial court with discretion as to intervention to safeguard the rights of interested parties. There is no time limitation as to intervention expressed in La. R.S. 13:5126. Additionally, there is no case law on point to confirm or negate the foregoing conclusion."

World Trade Ctr. III, 05-0048 at p. 3, 894 So.2d at 1188 (quoting World Trade Ctr. II, 04-1365 at p. 5, 883 So.2d at 462).
The court of appeal stated it found no need to revisit this issue. World Trade Ctr. III, 05-0048 at p. 3, 894 So.2d at 1188.
The District and WTC Entities argue the court of appeal's prior decisions neither considered nor decided the standing issue, and thus the appellate court erred in holding that standing was the law of the case under its two prior opinions in this suit. They contend that because they only challenged the timeliness of the intervention does not mean they conceded standing or waived their right to challenge it at a later date. The District filed a Peremptory Exception of No Right of Action, challenging the Intervenors' standing, on November 30, 2004, prior to the full trial on the merits.
We first note the District and WTC Entities, as plaintiffs, are not in the proper posture to file a peremptory exception of no right of action. An action can *630 only be brought by a person having a real and actual interest which he asserts. La. Code Civ. Pro. art. 681. The exception of no right of action is designed to test whether the plaintiff has a real and actual interest in the action. La.Code Civ. Pro. art. 927 A(5). The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit. Louisiana Paddlewheels v. Louisiana Riverboat Gaming Comm'n, 94-2015, p. 4 (La.11/30/94), 646 So.2d 885, 888. In this matter, the Hotel Association and Mr. Theriot moved to intervene as defendants. The plaintiffs are challenging the defendants status as "interested persons" under La.Rev.Stat. 33:9031.1 and the Bond Validation Statutes.
This litigation arose from the District filing a motion for judgment asking the court to declare the validity and legality of the Cooperative Endeavor Agreement, the Pledge Agreement and the WTC TIF statute, pursuant to La.Rev.Stat. 33:9031.1. This statute provides the procedure of the Bond Validation Statutes shall be applied to these motions. The Bond Validation Statutes are found at La.Rev.Stat. 13:5121-5130. They provide, in relevant part with regard to validation of cooperative endeavor agreements:
. . . In such motion for judgment the taxpayers, property owners and citizens of the issuing governmental units, including nonresidents owning property or subject to taxation therein, and all other persons interested in or affected in any way by the issuance of such bonds shall be made parties defendant.

La.Rev.Stat. 13:5123, (emphasis added). By publication of such motion for judgment, all taxpayers, property owners, and citizens of such governmental unit including nonresidents owning property or subject to taxation therein, and all other persons having or claiming any right, title, or interest in any property or funds to be affected in any way by the issuance of such bonds, or having or claiming to have any right or interest in the subject matter of such motion for judgment, shall be considered as parties defendant in such proceedings and as having duly been served, and the court shall have jurisdiction of them the same as if each of them were named individually as a party defendant in such motion for judgment and personally served with process.
La.Rev.Stat. 13:5124 A(2), (emphasis added).
The procedure for the judicial determination of the validity of cooperative endeavor agreements authorized by Chapter 27 of Title 33 is the procedure found in La.Rev. Stat. 13:5121 et seq. These statutes provide that "all persons interested in or affected in any way [by the cooperative endeavor] shall be made parties defendant" and further provide "all other persons . . . having or claiming to have any right or interest in the subject matter [the cooperative endeavor, pledge agreement and the WTC TIF statute] of such motion for judgment, shall be considered as parties defendant." The provisions of La.Rev.Stat. 33:9031.1 and the Bond Validation Statutes are intentionally broad so as to offer possible interested persons a full and fair opportunity to contest cooperative endeavor agreements before a court approves the agreement and forever precludes such challenges. After exercising its discretion to allow the Hotel Association and Mr. Theriot to intervene as defendants, the trial court, in effect, reversed itself by finding the Intervenors lacked standing as "interested persons" to challenge the WTC TIF statute, the Cooperative Endeavor *631 Agreement and/or the Related Documents.[5]
In their "exception" challenging the intervenors status as "interested persons," the plaintiffs confined their argument to assert that the intervenors had no standing to challenge the WTC TIF statute as an impermissible impairment of existing bond and contractual rights, because they were not bondholders of any of the entities that receive a portion of the hotel occupancy tax, and further, they have no contractual relationships allegedly being impaired. Without deciding whether the trial court was correct in finding intervenors had no standing to raise impairment issues, we find the trial court erred in holding intervenors lacked standing as defendants to assert a defense of unconstitutionality to the plaintiffs' motion for a judgment seeking the validity and legality of La.Rev.Stat. 33:9038.21.
Louisiana jurisprudence recognizes the right of a taxpayer to enjoin unlawful action by a public body. Louisiana Associated Gen. Contractors, Inc. v. Calcasieu Parish School Bd., 586 So.2d 1354, 1357 (La.1991). A taxpayer may resort to judicial authority to restrain public servants from transcending their lawful powers or violating their legal duties in any unauthorized mode which would increase the burden of taxation or otherwise unjustly affect the taxpayer or his property. Id., (citing Stewart v. Stanley, 199 La. 146, 5 So.2d 531 (1941)). "The fact that the taxpayer's interest may be small and insusceptible of accurate determination is not sufficient to deprive him of the right." Louisiana Associated Gen. Contractors, 586 So.2d at 1357-1358.
In League of Women Voters of New Orleans v. City of New Orleans, 381 So.2d 441 (La.1980), we were careful to point out that unlike a citizen attempting to compel the performance of a public duty, a citizen attempting to restrain unlawful action by a public entity is not required to demonstrate a special or particular interest distinct from that of the public at large. Louisiana Associated Gen. Contractors, 586 So.2d at 1358. Consequently, taxpayers seeking to restrain action by a public body are afforded a right of action upon a mere showing of an interest, however small and indeterminable. Id. Given the Bond Validation Statutes' broad language of those who shall be made defendants in these proceedings, and the undisputed fact that the intervenors are taxpayers in Louisiana, we find no error by the court of appeal in holding the trial court erred in finding the Intervenors were not "interested persons."
In its motion for judgment, the District also sought a judgment declaring the validity, legality and effectiveness of Act No. 47 of the First Extraordinary Session of the Louisiana Legislature of 2002,[6] which the trial court granted. Thus the issue of whether the enactment of La.Rev. Stat. 33:9038.21 was a valid exercise of the *632 Legislature's plenary power was placed at issue by the plaintiffs, the District and the WTC Entitites. We now turn to the WTC TIF statute in order to decide its constitutionality, vel non.

Constitutional Interpretation Principles
In determining the constitutionality of the statute at issue, it is important to keep certain principles in mind. It is well settled that statutes are presumed constitutional unless fundamental rights, privileges and immunities are involved. This presumption is especially forceful in the case of statutes enacted to promote a public purpose, such as statutes relating to taxation and public finance. Unlike the federal constitution, our state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people exercised through the legislature. Caddo-Shreveport Sales and Use Tax Comm'n. v. Office of Motor Vehicles through Dep't. of Public Safety and Corrections, 97-2233, p. 5 (La.4/14/98), 710 So.2d 776, 779 (citing Chamberlain v. State through Dep't. of Trans. and Dev., 624 So.2d 874 (La.1993)).
The Louisiana Legislature, elected by the state's citizenry, may enact any legislation that the state constitution does not prohibit. Polk v. Edwards, 626 So.2d 1128, 1132 (La.1993). Thus, in order to hold legislation invalid under the constitution, it is necessary to rely on some particular constitutional provision that limits the power of the legislature. Id. (citing In re American Waste & Pollution Control Co., 588 So.2d 367 (La.1991); Board of Directors of Louisiana Recovery Dist. v. All Taxpayers, Property Owners, etc., 529 So.2d 384 (La.1988)). A party seeking a declaration of unconstitutionality must point to a particular provision which would prohibit the legislature from enacting such a statute. It must be shown clearly and convincingly that it was the constitutional aim to deny the legislature the power to enact the statute in question. Caddo-Shreveport Sales and Use Tax Comm'n., 97-2233, pp. 5-6, 710 So.2d at 779, (citing Louisiana Recovery Dist., 529 So.2d at 388). However, a constitutional limitation on legislative power may be either express or implied. Caddo-Shreveport Sales and Use Tax Comm'n., 97-2233 at p. 6, 710 So.2d at 779-780, (citing Board of Comm'rs of North Lafourche Conservation Levee and Drainage Dist. v. Board of Comm'rs of Atchafalaya Basin Levee Dist., 95-1353 (La.1/16/96), 666 So.2d 636, reh'g denied 2/16/96). When a constitutional challenge is made, the question is whether the constitution limits the legislature, either expressly or impliedly, from enacting the statute at issue. Caddo-Shreveport Sales and Use Tax Comm'n., 97-2233 at p. 6, 710 So.2d at 780. The constitution is the supreme law, to which all legislative acts must yield. Id. (citing Macon v. Costa, 437 So.2d 806 (La.1983)).
Bearing these principles in mind, we turn to the crucial question of whether the legislature suspended, within the WTC Taxing District, the various laws that together authorize the levy and collection of hotel occupancy taxes in Orleans Parish, or exempted hotel(s) in the WTC Taxing District from these taxes.

Suspension or Exemption

La. Const. art. III, § 20, La. Const. art. VI, § 29
Germane to our decision is the hotel occupancy tax levied and collected in Orleans Parish, which totals thirteen percent. Four percent (4%) of this tax is levied by the Louisiana Stadium and Exposition District (LSED), authorized by La. Const. (1921) art. XIV, § 47(M), continued as a statute pursuant to La. Const. (1974) art. XIV, § 16(A)10. Three percent (3%) of this tax is levied by the *633 New Orleans Exhibition Hall Authority (NOEHA), authorized by 1978 La. Acts No. 305, as amended by 1980 La. Acts No. 99 and 2002 La. Acts, 1st Ex.Sess. No. 72. The remaining six percent (6%) of the tax, authorized by various Acts of the Legislature, is apportioned as follows: Orleans Parish School Board 1.5%; Regional Transit Authority (RTA) 1%; City of New Orleans 1.5%; New Orleans Tourism & Economic Development Fund 1%; New Orleans Metropolitan Convention & Visitors Bureau .97%; and Louisiana Tourism Promotion District .03%. The WTC TIF statute authorizes the District, acting by and through its board of commissioners, to levy and collect a hotel occupancy tax within the District at a rate at least equal to the aggregate rate of all such taxes levied and collected within Orleans Parish. See La.Rev.Stat. Ann. 33:9038.21 F(1).[7] The WTC TIF further provides:
It is hereby recognized that without the accomplishment of the purposes of the district that there would be no collection of a hotel occupancy tax by any taxing authority within the district. Accordingly if the district elects to levy and collect the tax authorized in this Subsection, such levy shall be deemed to supersede and be in lieu of any other tax on hotel occupancy within the district except for any such tax which is based on a per head or per person basis.
La.Rev.Stat. 33:9038.21 F(4), (emphasis added).
The District approved and adopted an ordinance levying the tax authorized by La. Rev.Stat. 33:9038.21 F.
Appellants aver the WTC TIF statute does not exempt the proposed hotel from the existing hotel occupancy tax, but rather, the statute suspends the laws imposing the tax. They argue the statute cannot exempt any taxes within the district, because no hotel occupancy taxes exist within the district to be exempted and the economic activity on which the tax would be leviedthe operation of a hotelcould not occur without the WTC TIF statute. Therefore, appellants contend, the WTC TIF statute is not subject to the provisions of La. Const. art. VI, § 29.
Appellees argue the WTC TIF statute enacts an exemption from the existing hotel occupancy tax. They contend a statute does not have to use the term "exemption" in order for the substance of that statute to be considered an exemption. Wooden v. Louisiana Tax Comm'n., 94-2481 (La.2/20/95), 650 So.2d 1157, 1161("Although [the statute] does not contain the word `exemption,' the words and form used legislatively in granting an exemption are not important if, in their essence, the Legislature creates an exemption."). Appellees urge the court of appeal correctly held the WTC TIF statute constitutes an exemption from the presently existing hotel occupancy tax.
After careful and studied review of La. Const. art. III, § 20 regarding suspension of laws, La. Const. art. VI, § 29 regarding sales tax, the transcripts of the constitutional convention relevant to these articles and the jurisprudence of this court, we conclude that La.Rev.Stat. 33:9038.21 F(4) enacts an exemption from the existing hotel occupancy tax collected in Orleans Parish. *634 We reject the appellants' argument that the WTC TIF statute cannot exempt hotel occupancy taxes within the district because none presently exist. The trial court held the statute does not establish an exemption "because no such taxes are currently being collected within the District and it is impossible for the statute to exempt from payment future taxes the Legislature has expressly determined do not exist and will not exist absent the accomplishment of the District's purposes." The court of appeal correctly reversed the trial court, stating "the factual finding by the legislature does not have the legal effect of amending the pre-existing hotel occupancy taxes so as to render them inapplicable to any new hotel." World Trade Ctr. III, 05-0048 at p. 8, 894 So.2d at 1191. But for the WTC TIF statute, the Orleans Parish hotel occupancy taxes would be collected when the WTC hotel begins functioning. The hotel occupancy taxes are imposed on all hotels in Orleans Parish; it is irrelevant that the hotel does not presently exist. To prevent the levy of a hotel occupancy tax on a hotel in Orleans Parish necessarily involves the enactment of an exemption.
A leading authority describes tax exemption thusly:
An exemption shields from tax a transaction that otherwise would be subject to tax. Bruce J. Oreck, Louisiana Sales & Use Taxation § 4.1 (2d ed.1996). A tax exemption is a provision that exempts from tax a transaction that would, in the absence of the exemption, otherwise be subject to the tax. Id., § 3.1
The WTC TIF statute, by providing that any tax levied by the District "shall be deemed to supersede and be in lieu of any other tax on hotel occupancy within the district" clearly exempts a transaction that would otherwise be subject to the hotel occupancy taxes levied in Orleans Parish.
Further support for our determination can be found in our prior jurisprudence. In Wooden, supra, we found that although the statute did not contain the word "exemption," the words and form used in granting an exemption are not important if, in their essence, the Legislature creates an exemption. Wooden, 94-2481 at 8, 650 So.2d at 1161 (citing Meyers v. Flournoy, 209 La. 812, 25 So.2d 601 (1946); In re Pitre, 93-2322 (La.1/14/94), 630 So.2d 700, reh'g denied 2/10/94 (Calogero, C.J., concurring)). In Wooden, we considered the constitutionality of La.Rev.Stat. 9:2948.[8] The tax assessor for Morehouse Parish asserted the legislative act affording the homestead exemption to a non-owner violated La. Const. art. VII, § 20, which affords a homestead exemption from ad valorem taxes only to those who own and occupy the homestead. He further asserted the Legislature's grant of an exemption violates La. Const. art. VII, § 21, which sets forth an exclusive list of property, in addition to the homestead, that shall be exempt from ad valorem taxation. The trial court held the act an attempt to circumvent the constitution; that under Article VII, Section 21 there is a prohibition from extending any further ad valorem tax exemptions not authorized under Section 21.
*635 The attorney general contended that the Legislature did not create a new exemption from ad valorem taxes, but simply redefined ownership for purposes of bond for deed contracts or recognized a new level of ownership. We rejected that argument, finding the Legislature created a special statute defining ownership solely for the purpose of the homestead exemption, and thereby indirectly established an exemption from ad valorem taxes, in violation of our constitution. Wooden, 94-2481 at p. 8, 650 So.2d at 1161. With the enactment of La.Rev.Stat. 33:9038.21, the Legislature has indirectly established an exemption from the hotel occupancy taxes levied in Orleans Parish. The statute, by allowing hotel rooms in the district to escape liability for the Orleans Parish taxes, effectively grants an exemption. Therefore, we must determine whether this statute is in accordance with La. Const. art. VI, § 29.
Louisiana Constitution article VI, section 29(D) provides:
Exemptions; Protection of Bonds. Except when bonds secured thereby have been authorized, the legislature may provide for the exemption or exclusion of any goods, tangible personal property, or services from sales or use taxes only pursuant to one of the following:
(1) Exemptions or exclusions uniformly applicable to the taxes of all local governmental subdivisions, school boards, and other political subdivisions whose boundaries are not coterminous with those of the state.
(2) Exemptions or exclusions applicable to the taxes of the state or applicable to political subdivisions whose boundaries are coterminous with those of the state, or both.
(3) Exemptions or exclusions uniformly applicable to the taxes of all the tax authorities in the state.
The Legislature is constitutionally prohibited from exempting sales taxes where those taxes secure authorized bonds. The defendants allege that the four percent tax levied by the LSED secures bonds issued by that entity and the three percent tax levied by the NOEHA secures bonds issued by that entity. At the trial of this matter, documentary evidence of these bonds was introduced. The District and WTC Entities stipulated to the authenticity of the evidence and that sums remained outstanding under the bonds. Clearly, the Legislature is prohibited by Article VI, Section 29(D) from enacting an exemption from these hotel occupancy taxes which secure bonds.
Appellants argue Section 29 is intended to prohibit exemptions only if the exemption would impair authorized or issued bonds. They rely upon Article VI, Section 29(C), which provides:
Bonds; Security. Nothing in this Section shall affect any sales or use tax authorized or imposed on the effective date of this constitution or affect or impair the security of any bonds payable from the proceeds of the tax.
Appellants rely upon a partial statement from one of the delegates to the 1973 Constitutional Convention to support their contention that Section 29(D) was intended to prohibit the exemption of taxes only if the exemption would impair authorized or issued bonds:
Mr. Lanier: . . . The primary requirements of the bond attorneys are: One, that nothing in this section could be construed as affecting outstanding bonds. Two, that exemptions could not be made to retroactively apply to bonds already issued. . . .

*636 This is intended to follow the requirement of the present statutory provision [La.Rev.Stat. 33:2717.8] that with reference to this bond, you cannot affect the security until such time as those bonds are retired.
La. Const. Conv.1973 Verbatim Transcripts, Vol. XXVI, Day 80, pp. 4, 7.
In addition, appellants also rely upon the comment that "[t]he only limitation on the legislature's authority in this regard [right of the legislature to enact subsequent exemptions from tax which would control over local tax provisions to the contrary] relates to the impairment of tax revenues realized to secure bonds issued by local authorities." Oreck, § 1.4[1](C), fn. 48. The appellants fail to quote the remainder of Mr. Oreck's footnote, which states: "[i]n such circumstances, a subsequently enacted exemption or exclusion would be without effect as to those authorities which have issued bonds secured by tax revenues until such time as the bonds are retired." Id.[9] Mr. Oreck does not declare, much less imply, that it must be proven that bonds would be impaired before a court can find the exemption where bonds have been authorized violates Section 29.
A careful reading of the proceedings in the constitutional convention evidences that the drafters were concerned with prohibiting exemptions or exclusions where bonds were authorized, and not, as appellants advocate, allowing subsequent exemptions where there is no proof that the exemptions will materially impair the bonds. As the court of appeal noted, although no cases exist that deal specifically with exemptions where bonds are authorized, there are several attorney general opinions that uniformly state the constitutional provision is clear that exemptions are prohibited when bonds have been authorized.
In explaining the purpose of the restrictive language in Paragraphs (C) and (D), Mr. Lanier, a co-drafter of the Section, made it clear that this language was designed to ensure the bondholder's security in an undiminished tax base would be guaranteed:
MR. LANIER
. . . The third thing was the requirement that . . . no future exemption could impair the tax base upon which bonds were issued. If this were done, quite frankly, it would be in violation of the United States Constitution because you cannot divest anyone of a vested right. To make sure that is absolutely clear with reference to the exemptions and the base that supports the bonds and the tax, we put in Paragraph (B).[10]
La. Const. Conv.1973 Verbatim Transcripts, Vol. XXV, Day 79, p. 62.
MR. LANIER
I believeand this is the specific language that was suggested to us to cover this problemyou cannot retroactively remove from the tax base which . . . upon which a bonded indebtedness is based, the security for that indebtedness. This language is designed to prohibit that type of conduct.
79th day's proceedings at page 62
*637 By further explanation, Mr. Lanier quotes from La.Rev.Stat. 33:2717.8, which prohibits the legislature from making any changes resulting in a diminution in the amount of tax revenues received by the governmental entity which issued the bonds, and then concludes:
MR. LANIER
Well, my explanation is: This [constitutional limitation] is intended to follow the requirement of the present statutory provision that with reference to this bond, you cannot affect the security until such time as those bonds are retired.
80th day's proceedings at page 7.
In his final explanation to the delegates, Mr. Pugh, a co-drafter of the Section, explains the purpose for the limitation on the legislature's power to grant tax exemptions as follows:
MR. PUGH
First of all, obviously any bonds which have been issued based on a particular basis where no exemptions for drugs or other items existed that the people who hold those bonds are entitled to look to that entire base until those bonds are paid off. In good faith they bought those bonds on the premise that there would be a specific base for those bonds, and they have the right for that base not to change, and that's both a contractual and a constitutional right that they have.
80th day's proceedings at page 9.
The language contained in Section 29(C) and (D) was overwhelmingly supported by the redactors as evidenced by the 88-11 vote for adoption. The legislature is prohibited under Section 29(D) from enacting tax exemptions where those taxes secure bonds already authorized. Paragraph (C) further clarifies this legislative prohibition with regard to taxes and/or exemptions in existence at the time of the adoption of this new constitution, especially necessary because the 1921 Constitution did not contain any such provision. Considering the quoted proceedings in the Constitutional Convention of 1973, it would be unreasonable to interpret these paragraphs as prohibiting exemptions of taxes that secure bonds only if it can be demonstrated the bonds are impaired by such an exemption. The impairment language was included to protect bonds authorized but not yet issued at the time of the drafting and adoption of the 1974 Louisiana Constitution. La. Const. Conv.1973 Verbatim Transcripts, Vol. XXVI, Day 80, p. 4 ("[W]e have received advice from the bond attorney[s] that the committee proposal would need to be redrafted in several respects in order to cure certain problems affecting bonds which have been authorized but have not been issued. . . . We feel this amendment will do the job and furnish the protection for these authorized but unissued bonds. . . .") In mandating the exemption from hotel occupancy taxes, the proceeds of which secure authorized bonds, La.Rev.Stat. 33:9038.21 F(4) is unconstitutional, in violation of La. Const. art. VI, § 29(D).

Severability
The unconstitutionality of one portion of a statute does not necessarily render the entire statute unenforceable. Pierce v. Lafourche Parish Council, 99-2854, p. 9 (La.5/16/00), 762 So.2d 608, 615. The test for severability is whether the unconstitutional portions of the statute are so interrelated and connected with the rest of the statute that they cannot be separated without destroying the intention manifested by the legislature in passing the act. Id.; Perschall v. State, 96-0322, p. 29 (La.7/1/97), 697 So.2d 240, 260, reh'g denied 9/5/97; Polk, 626 So.2d at 1148. The test is whether the legislature would have passed the statute had it been presented with the invalid features removed. Perschall, *638 96-0322 at p. 29, 697 So.2d at 260; Succession of Lauga, 624 So.2d 1156, 1171-72 (La.1993), reh'g denied. Where the purpose of the statute is defeated by the invalidity of part of the act, the entire act is void. Perschall, 96-0322 at p. 29, 697 So.2d at 260; Louisiana Associated Gen. Contractrors, Inc. v. State through Div. of Admin., 95-2105, p. 22 (La.3/8/96), 669 So.2d 1185, 1201.
The statute before us authorizes the District to levy and collect a hotel occupancy tax within the district, and further provides "[t]he tax rate for such tax shall be at least equal to the aggregate rate of all such taxes levied and collected within the Parish of Orleans by the state of Louisiana, local governmental subdivisions, and other political subdivisions or special taxing districts." La.Rev. Stat. 33:9038.21 F(1), (emphasis added). The WTC TIF statute further provides if the District elects to levy and collect such tax, "such levy shall be deemed to supersede and be in lieu of any other tax on hotel occupancy within the district. . . ." La.Rev. Stat. 33:9038.21 F(4), (emphasis added). Given that the statute mandates a tax rate at least equal to the Orleans Parish hotel occupancy taxes, and that the WTC District tax cannot constitutionally equal this tax rate because 7% of the WTC District tax cannot supersede and be in lieu of the tax that secures bonds, we find the remaining portion of the law is not severable from the offending portion. Therefore, La.Rev.Stat. 33:9038.21 is unconstitutional in its entirety.

CONCLUSION
For the foregoing reasons, we find La. Rev.Stat. 33:9038.21 creates an exemption from the hotel occupancy taxes that the proposed hotel in the WTC Taxing District would otherwise be subject to. Because seven percent of the hotel occupancy tax levied in Orleans Parish secures bonds, the Legislature is prohibited from exempting services from these taxes, pursuant to La. Const. art. VI, § 29(D). We further find the unconstitutional portion of the statute is not severable, as the statute mandates the WTC District tax must be at least equal to the Orleans Parish hotel occupancy taxes. Our finding that the District cannot levy seven percent of the thirteen percent tax necessarily renders the entire statute unconstitutional, because of its language in subparagraphs F(1) and (4). Because we find La.Rev.Stat. 33:9038.21 unconstitutional on these grounds, we pretermit discussion of the remaining constitutional challenges.[11]
We are not fully in accord with the rationale of the court of appeal, but we find the court of appeal reached the correct result. Accordingly, the judgment of the court of appeal is affirmed.

DECREE
For the foregoing reasons, we affirm the judgment of the court of appeal.
AFFIRMED.
JOHNSON, Justice dissents for the reasons that follow.
The majority opinion, and the 4th Circuit Court of Appeal, have adopted the reasoning of the interveners that the tax increment financing (TIF) plan outlined in La.R.S. 33:9038.21 is unconstitutional, pursuant to La. Const. art. VI, § 29(D), because the statute, by allowing hotel rooms in the district to escape liability for the Orleans Parish hotel occupancy taxes, effectively *639 grants a tax exemption. In my opinion, the language of La. R.S. 33:9038.21(F)(4) supports the conclusion that the statute authorizes a tax levy rather than a tax exemption.
The conclusion that the World Trade Center (WTC) TIF statute authorizes a hotel occupancy tax levyalbeit one that is allocated differently from other Orleans Parish hotel occupancy taxesrather than providing a tax exemption, which is a tax that is neither levied, collected, nor allocated, is consistent with the plain language of the WTC TIF statute, and with the historical and contemporary mechanics of TIF financing.
Tax increment financing, a public/private financing system that has been in operation for over fifty years and is provided for, by statute, in forty-eight states, was first implemented in 1952 by the state of California as a local means of raising revenue to finance the improvement of blighted property[1]. The use of tax increment financing expanded throughout the nation during the mid 1970s to the late 1980s and by 1997, forty-eight states had passed tax increment financing legislation, North Carolina and Delaware being the exceptions[2]. Among the significant contributing factors to the expanded use of tax increment financing are (1) the decline in federal aid and (2) enormous public pressure against general tax increases[3]. According to one commentator, "the use of TIF has expanded in reaction to the decreased availability of federal funds for economic development projects and infrastructure improvements."[4] Another commentator noted that one of "the primary advantages of tax increment financing rests in the fact (that) redevelopment revenues are generated from the project area alone and not subsidized by city-wide property taxes, thereby obviating the necessity of increasing property taxes to support the project area.[5]" As a result, tax increment financing has emerged as one of the most widely used methods by state and local governments for achieving economic development[6].
The majority of states authorizing TIF projects limit their programs to property taxes[7]. However, a few states, including Louisiana, have included other taxes, typically sales and use taxes, in TIF programs *640 also[8]. Although some specific features of property and non-property tax TIF programs differ, much of what can be said about property tax TIF's also applies to non-property tax TIF programs also[9].
A typical TIF redevelopment plan[10] encompasses five stages: (1) initiation, (2) formulation, (3) adoption, (4) implementation, and (5) evaluation and termination[11]. The first stage involves recognition by public and private entities that an area is underdeveloped or blighted[12]. The second stage involves the formulation of a detailed redevelopment plan, which includes construction of an office complex, commercial, industrial, or residential development[13]. The plan will also declare the geographic boundaries of the proposed area and anticipated costs of improvements, which serve to make the project more attractive to private developers[14]. Third, is the adoption of the redevelopment plan. The fourth stage, and for our purposes the most significant stage in the process, is the implementation of the plan; this involves property value assessment and the allocation of tax increment revenues[15].
During the implementation stage, the current level of taxes being paid by the proposed redevelopment project is "frozen" at its current level. (With the WTC District, since there is presently no existing hotel paying any hotel occupancy taxes to any taxing entity, the "frozen" level is essentially zero.) Then, the difference between the subsequent tax revenues generated from the improved or developed property and those collected at the "frozen" level become the tax increment which is allocated to pay for the financing of the project. (In the proposed WTC hotel project, the increment would have been the difference between the hotel occupancy tax levy authorized by the WTC TIF statute, a minimum of 13%, and the "frozen" hotel occupancy tax level currently being paid, which, again, is 0%. Therefore, the difference, 13% hotel occupancy tax, would have been allocated to paying for the redevelopment project.) The process is summarized by one commentator as follows:
Once the TIF project is approved, property tax assessment in the project area are "frozen," and existing recipients of that property tax money are guaranteed to receive all taxes levied on these assessments for the duration of the project. . . The property owner pays all taxes due on the property based on its actual value, however, and all revenues from any increases in tax assessments that occur because of the redevelopment ("tax increments") are used to repay the bonds issued to fund the project. When all of the municipality's costs have been paid, or the bonds are retired, the TIF district's tax assessments are unfrozen and all taxing districts receive increased revenues from the redeveloped land[16]. (Emphasis added)
Similarly, in the present case, the revenues from the increases in the proposed, and statutorily authorized, hotel occupancy *641 taxes levied and collected in the WTC District that occurred because of the redevelopment of that District were to be used to repay the bonds issued to fund the project. This well-settled method of TIF borrowing techniques explains the WTC TIF statutory language, cited by the majority opinion for their conclusion that the statute provided a tax exemption, that provides that "if the district elects to levy and collect the tax authorized in this Subsection, such levy shall be deemed to supersede and be in lieu of any other tax on hotel occupancy within the district. . ." Generally accepted TIF borrowing methods also explain the WTC TIF statutory language that provides as follows: "The district may issue revenue bonds payable from an irrevocable pledge and dedication of up to the full amount of hotel occupancy tax increments, in an amount to be determined by the district, to finance or refinance any project or projects, or parts thereof, which are consistent with the purposes of the district." La.R.S. 33:9038.21(G)(1)(a). The above described financing methods dictate how a tax levy will be allocated after the tax is collected, not that a tax exemption is provided. Specific to this discussion, which is typically brought as an equal protection constitutional challenge by entities, like the interveners in the present case, who are outside the redevelopment area, are the following observations by one commentator on TIF programs:
taxpayers outside the redevelopment area have charged that those within the area are specially advantaged. . .As long as those who redevelop property pursuant to the TIF plan pay taxes at the same rate as the other property owners in the municipality, no constitutional problem is created since tax revenues above the original assessed value are allocated to a special fund for use by the redevelopment agency. Thus, tax increment financing does not create a partial tax exemption; it merely affects the use of taxes after their collection. Owners of property inside the project pay property taxes at the same rate as property owners outside the project where classification and assessment procedures are uniform . . . It is only the manner in which taxes are divided after their collection that distinguishes property located in a tax increment redevelopment project from other property in the municipality. Thus, the mere fact that some tax revenues collected from properties within the tax increment redevelopment project are diverted from financing municipal services during the life of the project will not sustain an equal protection challenge[17].
This reasoning was embraced by the Utah Supreme Court in Tribe v. Salt Lake City Corp., 540 P.2d 499 (1975), an often cited case regarding the constitutionality of tax increment financing programs, where Justice Crockett, in a concurring opinion, held that "the appropriate test is whether the property of all taxpayers, within and without the project area, was subject to equal assessment and uniform tax rates." Id. at 506. Similarly, the Supreme Court of Iowa, in Richards v. Muscatine, 237 N.W.2d 48 (1975), rejected the plaintiffs' argument that the subject tax increment financing plan created a tax exemption. The court held that the TIF statute "can hardly be said to create a partial exemption for the urban renewal developer. He will pay taxes at the same rate as everyone else," the TIF statute "only affects the use of taxes after collection." Id. at 60.
*642 In the present case, La.R.S. 33:9038.21(F)(1) authorizes the WTC District, "to levy and collect a tax upon the occupancy of hotel rooms," like all other hotels in Orleans Parish. Further, La.R.S. 33:9038.21(F)(1) provided that the "tax rate for such tax shall be at least equal to the aggregate rate of all such taxes levied and collected within the parish of Orleans." Therefore, a uniform hotel occupancy tax levy was authorized by the WTC TIF statute; the antithesis of an unconstitutional tax exemption, as determined by the majority opinion.
The majority opinion also relies on Wooden v. Louisiana Tax Comm'n, 94-2481 (La.2/20/95), 650 So.2d 1157, 1161 for the proposition that "(a)lthough (the statute) does not contain the word `exemption,' the words and form used legislatively in granting an exemption are not important if, in their essence, the Legislature creates an exemption." The problem here is that the WTC TIF statute, as noted above, does not, in its essence, create an exemption; it authorizes a tax levy, which is the opposite of a tax exemption.
Additionally, the majority opinion cites Bruce J. Oreck, Louisiana Sales and Use Taxation, § 4.1 and 3.1 (2d ed.1996), for the following propositions: "An exemption shields from tax a transaction that otherwise would be subject to tax," and "A tax exemption is a provision that exempts from tax a transaction that would, in the absence of the exemption, otherwise be subject to the tax." This rule enunciated by Oreck supports the contention that the WTC TIF statute authorizes a tax levy rather than a tax exemption. In his chapter on Exemptions, Oreck discusses tax exemptions authorized in relation to Louisiana Superdome activities. Oreck states as follows:
"A statute that came into Louisiana law as part of the effect to keep the Saints football team from leaving the state is the exemption from state and local sales tax on football tickets sales for football games held in the Louisiana Superdome. . . Thus, any event, activity or enterprise, or the right of admission thereto, as well as any sale, service or other transaction occurring in the Superdome is exempt from state and local tax. This exemption even extends to parking charge and Superdome tours." Id. at 4-90.
The relevant statute providing this exemption is La.R.S. 39:467, which provides in pertinent part, that specific events, activities, or enterprises "shall be exempt from all present and future taxes levied by the state or by any local taxing authority. . ." The statute highlights the distinction between a tax exemption and a tax levy; the two are separate and distinct; they cannot co-exist.
Since the plain language of the WTC TIF statute authorizes a hotel occupancy tax levy, it cannot simultaneously provide a hotel occupancy tax exemption. La.R.S. 33:9038.21(F)(1) provides that in "order to provide funds for the purposes of the district, the district, acting by and through its board of commissioners, is hereby authorized to levy and collect a tax upon the occupancy of hotel rooms, motel rooms, and overnight camping facilities within the district." The majority opinion determined that the "District approved and adopted an ordinance levying the tax authorized by La. R.S. 33:9038.21 F." Furthermore, La.R.S. 33:9038.21(F)(1) provides that the hotel occupancy tax rate imposed by the WTC District "shall be at least equal to the aggregate rate of all such taxes levied and collected within the parish of Orleans by the state of Louisiana, local governmental subdivisions, and other political subdivisions or special taxing districts," and that the "tax shall be *643 paid by the person who exercises or is entitled to occupancy of the hotel room, and shall be paid at the time the rent or fee of occupancy is paid." Thus, the statute provides for the collection and levy of the hotel occupancy tax within the WTC district and specifies that the tax shall be at least equal to the aggregate rate, or 13%, levied by all other hotels in Orleans Parish, and paid by the hotel occupants. Therefore, the majority erred in concluding that the WTC TIF statute authorized a tax exemption rather than a tax levy; allocation of the tax after it is collected does not change the inherent character of the tax.
By holding the WTC TIF statute unconstitutional, despite its authorization of a uniform hotel occupancy tax levy, and the absence of a tax exemption, the majority opinion transgresses, what this court has previously held to be, the Legislature's plenary power to create any type of special district and to confer upon the district any power the Legislature deems proper, including the power to tax and to issue debt. The Board of Directors of the Louisiana Recovery District v. All Taxpayers, et al., 529 So.2d 384 (La.1988). Furthermore, the majority opinion violates the well-settled rule of statutory construction that the presumption of constitutionality "is especially forceful in the case of statutes enacted to promote a public purpose, such as statutes relating to taxation and public finance." Id. at 387.
NOTES
[*] Retired Judge Lemmie O. Hightower assigned as Associate Justice ad hoc, sitting for Associate Justice Chet D. Traylor, recused.
[1] While both 99-year leases were executed in 2001, and subsequently amended in 2003, they both have delayed effective dates, as specified in the leases, related to the completion, opening and initial operation of the hotel.
[2] Acts 2002, 1st Ex.Sess., No. 47, enacted La.Rev.Stat. 33:9038, 33:9039, and 33:9040, which sections were redesignated as La.Rev. Stat. 33:9038.21, 33:9038.22 and 33:9038.23, respectively, and designated as Part III of Chapter 27 of Title 33, "Special Taxing Districts for Cooperative Economic Development Purposes", pursuant to the statutory revision authority of the Louisiana State Law Institute.
[3] La.Rev.Stat. 33:9031.1 is contained in Chapter 27, "Cooperative Economic Development," Part I, "General Provisions." It provides:

In order to provide a uniform, expeditious, and equitable procedure, with due regard for the public fisc and rights of persons in interest, for the judicial determination of the validity of any cooperative endeavor agreements authorized under this Chapter or generally by Article VII, Section 14(C) of the Louisiana Constitution and the transactions contemplated thereby; the provisions of Part XIV of Chapter 32 of Title 13 of the Louisiana Revised Statutes of 1950, as amended, shall be applicable thereto, and suits to determine the validity of such cooperative endeavor agreements may be filed thereunder in the district court having jurisdiction for any part thereto as though such agreements constituted the issuance of bonds of a governmental unit.
[4] For a full discussion of the proceedings prior to this trial, see World Trade Ctr. Taxing Dist. v. All Taxpayers, 04-0572 (La.App. 4 Cir. 5/19/04), 875 So.2d 850, (hereinafter World Trade Ctr. I). See also World Trade Ctr. Taxing Dist. v. All Taxpayers, 04-1365 (La.App. 4 Cir. 9/1/04), 883 So.2d 459, (hereinafter World Trade Ctr. II).
[5] We also note, in the record before us, there is no indication the District plead Intervenors lacked capacity as "interested persons" when the plaintiffs opposed the intervenors motion to intervene as defendants. Nor did the plaintiffs take writs from the court of appeal's finding that "[r]elator does not dispute that the Hotel Association and Theriot are interested persons as provided by La. R.S. 13:5126." WTC I, 04-0572 at p. 2, 875 So.2d at 852. Indeed, the District and the WTC Entities did not raise this argument until the eve of the full trial on the merits. The "exception" was filed on November 30, 2004, after the limited new trial was held on June 22, 2004, from which an appeal was taken and an opinion rendered by the court of appeal on September 1, 2004, remanding the matter to the trial court for the full hearing, which was held on December 2 and 9, 2004.
[6] This Act enacted the WTC TIF statute.
[7] La.Rev.Stat. 33:9038.21 F(1) provides:

In order to provide funds for the purposes of the district, the district, acting by and through its board of commissioners, is hereby authorized to levy and collect a tax upon the occupancy of hotel rooms, motel rooms, and overnight camping facilities within the district. The tax rate for such tax shall be at least equal to the aggregate rate of all such taxes levied and collected within the parish of Orleans by the state of Louisiana, local governmental subdivisions, and other political subdivisions or special taxing districts.
[8] In 1993, the Legislature enacted La.Rev. Stat. 9:2948, which provides:

Notwithstanding any other provisions of law to the contrary, the buyer under a bond for deed contract shall be deemed, for purposes of the homestead exemption only, to own any immovable property he has purchased and is occupying under bond for deed, and may be eligible for the homestead exemption provided in Article VII, Section 20(A) of the Constitution of Louisiana if otherwise qualified. The buyer under a bond for deed contract shall apply for the homestead exemption each year.
[9] See generally, Records of the Louisiana Constitutional Convention of 1973, Transcripts, Vol. VIII, pages 2157-66.
[10] As originally proposed, the section was number 34 of Committee Proposal No. 17 and consisted of paragraphs (A) and (B). Official Journal of the Constitutional Convention of 1973, vol. 1, 79th Days Proceedings, pp. 737-738. This section was ultimately enacted as La. Const. art. VI, § 29. Official Journal of the Constitutional Convention of 1973, vol. 2, Constitutional Convention CalendarCommittee Proposals, pp. 15, 18-19.
[11] Included in the pretermitted issues is the question of whether the pledge of public funds to secure bonds issued by a private entity is a prohibited donation, which may be suspect under La. Const. art. VII, § 14.
[1] Jonathan M. Davidson, Tax Increment Financing as a Tool for Community Redevelopment, 56 JOURNAL OF URBAN LAW 405, 406 (1979); M. Duane Coyle and Randall V. Reece, Urban Redevelopment: Utilization of Tax Increment Financing, 19 WASHBURN LAW JOURNAL 536, 537 (1980); Christina G. Dudley, Tax Increment Financing for Redevelopment in Missouri: Beauty and the Beast, 54 UMKC L.REV. 77 (1985); Joseph F. Luther, Tax Increment Financing: Municipalities Avoiding Voter Accountability, 1987 DET. C.L.REV. 89, 91; Julie A. Goshorn, In A TIF: Why Missouri Needs Tax Increment Financing Reform, 77 WASH.U.L.Q. 919, 925 (1999); Craig L. Johnson and Joyce Y. Man, editors, Tax Increment Financing and Economic Development: Uses, Structures, and Impact 1 (2001).
[2] Craig L. Johnson and Kenneth A. Kriz, "A Review of State Tax Increment Financing Laws," in Tax Increment Financing and Economic Development: Uses, Structures, and Impact 31 (2001).
[3] Id.
[4] J. Drew Klacik and Samuel Nunn, "A Primer on Tax Increment Financing" in Tax Increment Financing and Economic Development: Uses, Structures, and Impact 15, 18 (2001).
[5] Coyle and Reece, supra note 1, at 540.
[6] Joyce Y. Man, "Introduction," in Tax Increment Financing and Economic Development: Uses, Structures, and Impact 1 (2001).
[7] John L. Mikesell, "Nonproperty Tax Increment Programs for Economic Development: A Review of the Alternative Programs," in Tax Increment Financing and Economic Development:Uses, Structures, and Impact 57 (2001).
[8] Id. at 58.
[9] Id.
[10] Goshorn, supra note 1, at 926-927, states that the "idea behind TIF is simple and elegant, and most states follow a standard procedure under their TIF statutes."
[11] Johnson and Kriz, supra note 2, at 32.
[12] Id.
[13] Id.; Davidson, supra note 1, at 407.
[14] Goshern, supra note 1, at 926.
[15] Johnson and Kriz, supra note 2, at 32.
[16] Goshern, supra note 1, at 927-928.
[17] Gary P. Winter, Tax Increment Financing: A Potential Redevelopment Financing Mechanism for New York Municipalities, 18 FORDHAM URBAN L.J. 655, 667-668.