979 So.2d 460 (2008)
SOUTHERN SILICA OF LOUISIANA, INC. and Mid State Sand and Gravel Company, LLC.
v.
LOUISIANA INSURANCE GUARANTY ASSOCIATION.
No. 2007-CA-1680.
Supreme Court of Louisiana.
April 8, 2008.
*462 Allen & Gooch, Raymond C. Jackson, III, Lafayette, for appellant.
Kantrow, Spaht, Weaver & Blitzer, Richard F. Zimmerman, Jr., Randal James Robert, Travis Brendon Wilkinson, Baton Rouge; James D. Caldwell, Attorney General, Ryan Michael Seidemann, Assistant Attorney General, for appellee.
Celeste D. Elliott, New Orleans, for amicus curiae, Complex Insurance Claims Litigation Association.
WEIMER, Justice.
Upon application by the defendant, we docketed review of this declaratory judgment action as an appeal. Southern Silica of Louisiana, Inc. v. Louisiana Insurance Guaranty Association, 07-1680 (La.12/7/07), 969 So.2d 615. This court exercises its appellate jurisdiction under La. Const. art. V, § 5(D),[1] following a declaration by the court of appeal that Act 108 of 2004 was unconstitutional if applied retroactively to plaintiffs' action. See Southern Silica of Louisiana, Inc. v. Louisiana Insurance Guaranty Association, 06-2023 (La.App. 1 Cir. 7/13/07), 966 So.2d 45.
Finding both lower courts erred, we reverse and render. We hold that the challenged statutory provision can be read so as to avoid any constitutional infirmity even if the provision is applied retroactively to plaintiffs' pending claims.

FACTS AND PROCEDURAL HISTORY
On February 1, 2004, a suit for declaratory judgment was filed by Southern Silica of Louisiana, Inc. and Mid State Sand and Gravel Company, L.L.C. (collectively "Southern Silica"). In the petition, plaintiffs allege they have been named as defendants in approximately 500 silicosis suits filed in Louisiana, Texas, and Mississippi. The plaintiffs in the silicosis suits claim they were exposed to silica dust over long periods of time, with some exposure dates ranging from 1965 to 2003. In the instant action, Southern Silica seeks a declaration that the Louisiana Insurance Guaranty Association ("LIGA") owes them indemnity and/or defense for exposure dates during the years 1977 through 1982, when Southern Silica was insured by Reliance Insurance Company ("Reliance") under a number of commercial general liability and excess/umbrella liability policies.
In May of 2001, Reliance was placed in rehabilitation by the Pennsylvania Department of Insurance. On October 3, 2001, the Commonwealth Court of Pennsylvania declared Reliance insolvent and ordered its liquidation. Because Reliance has been declared insolvent and ordered liquidated, Southern Silica has no insurance coverage for the years 1977 through 1982.
Specifically, Southern Silica alleged (and the parties do not dispute) that although other insurance coverage is available for some of the exposure years identified in the 500 suits against them, absolutely no other insurance coverage, either primary or excess, is available for the years covered by the Reliance policies. Further, according to Southern Silica, some of the suits have been settled and Southern Silica has been obliged to pay the silicosis plaintiffs *463 out of company funds because of the lack of insurance coverage for the pertinent time period.
Thus, Southern Silica filed the instant suit for declaratory judgment, seeking a judicial decree that LIGA was statutorily obligated: (1) to provide it with a defense and indemnity for the years 1977 though 1982 in the pending suits and (2) to indemnify Southern Silica for payment of the prior settled claims.[2]
In February of 2004, when this action was filed, the statute at issue, LSA-R.S. 22:1386, which is entitled "Nonduplication of recovery," in paragraph A, provided:
Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer which is also a covered claim, shall be required first to exhaust his rights under such policy. Such other policies of insurance shall include but shall not be limited to liability coverage, uninsured or underinsured motorist liability coverage, or both, hospitalization, coverage under self-insurance certificates, coverage under a health maintenance organization or plan, preferred provider organization or plan, or similar plan, and any and all other medical expense coverage. All entities that are prohibited from recovering against the association, as specified in R.S. 22:1379(3)(b), shall also be considered insurers for purposes of this Subsection. As to the association, any amount payable by such other insurance shall act as a credit against the damages of the claimant, and the association shall not be liable for such portion of the damages of the claimant.
By 2004 La. Acts, No. 108, § 1, which became effective on August 15, 2004, LSA-R.S. 22:1386(A) was amended to include the following additional language:
In the case of a claimant alleging personal injury or death caused by exposure to asbestos fibers or other claim resulting from exposure to, release of, or contamination from any environmental pollutant or contaminant, such claimant must first exhaust any and all other insurance available to the insured for said claim for any policy period for which insurance is available before recovering from the association, even if an insolvent insurer provided the only coverage for one or more policy periods of the alleged exposure.
Section 3 of Act 108 further provides that: "[t]his Act shall apply to all covered claims, as defined in R.S. 22:1379, pending or arising after the effective date of the Act."
In 2006, LIGA filed a motion for summary judgment contending that, pursuant to the 2004 amendments to LSA-R.S. 22:1386(A), an insured must first exhaust any and all other insurance available for any policy period for which insurance is available before recovering from LIGA, even if an insolvent insurer had provided the only coverage for a certain period of the alleged exposure. Specifically, LIGA contended that "Southern Silica's other solvent insurers must first absorb Reliance's share of defense and indemnity to the extent of their policies" before Southern Silica could claim defense and indemnity from LIGA.
*464 At the conclusion of a hearing, the trial court granted LIGA's motion for summary judgment, stating as follows:
This court finds that the recent amendment to LA[.] R.S. 22:1386 requires the other insurance companies to fill in the gap left by the insolvency of Reliance. This court further finds this amendment applies retroactively because it is procedural in nature. Southern Silica did not have a vested right to have Louisiana Insurance Guaranty Association provide a defense to it; therefore, there is no genuine issue of material fact that Louisiana Insurance Guaranty Association is not required to provide a defense to Southern Silica.
A written judgment dismissing Southern Silica's claims with prejudice was signed on June 19, 2006. The judgment further provided that:
SOUTHERN SILICA OF LOUISIANA, INC. and MID STATE SAND AND GRAVEL COMPANY, LLC shall not be prevented from claiming defense and indemnity from LIGA but only after all other insurance coverage available to SOUTHERN SILICA OF LOUISIANA, INC. and MID STATE SAND AND GRAVEL COMPANY, LLC for any and all coverage periods has been fully exhausted and upon satisfying all other requirements of the LIGA statute.
Southern Silica appealed, contending that the trial court erred: (1) in failing to apply the law in effect at the time that Southern Silica's cause of action accrued, namely the Louisiana Supreme Court's holding in Hall v. Zen-Noh Grain Corporation, 01-0324 (La.4/27/01), 787 So.2d 280; and (2) in applying the 2004 amendment to LSA-R.S. 22:1386(A) to Southern Silica's suit for declaratory judgment.
Noting the specific declaration in Act 108 that it should apply to all pending covered claims as well as subsequent claims, the majority of the appellate court panel observed that even where the legislature has expressed its intent to give a law retroactive effect, the law may not be applied retroactively if doing so would impair contractual obligations or disturb vested rights in violation of the Contract and Due Process Clauses of the federal and state constitutions. U.S. Const. art. 1, § 10, cl. 1; U.S. Const. Amend. XIV § 1; La. Const. art. I, §§ 2, 23; Southern Silica, 06-2023 at 11, 966 So.2d at 54-55. After an in-depth analysis, the panel majority concluded retroactive application of Act 108 would impair the private contractual rights of Southern Silica and its solvent insurers and divest Southern Silica of vested property rights acquired, asserted, and accrued prior to the passage of Act 108.
In a concurring opinion, the third member of the appellate court panel disagreed that there was an impairment of contracts, but agreed that retroactive application of Act 108 would divest Southern Silica of rights against LIGA that had vested prior to the enactment.

DISCUSSION
The instant litigation involves one facet of the significant exposure theory which this court has adopted to determine the accrual date of a long-latency occupational disease: the logical consequence that the rule of proration of liability applies to the insurance carriers that were on the risk during the various periods of exposure to contaminating activities. Norfolk Southern Corporation v. California Union Insurance Company, 02-0369, p. 42 (La.App. 1 Cir. 9/12/03), 859 So.2d 167, 198, writ denied, 03-2742 (La.12/19/03), 861 So.2d 579, citing Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir.1981), cert. *465 denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).
One of the most perplexing issues that arises in long-latency occupational disease cases involves the determination of when a cause of action for tort liability accrues, since insidious diseases, such as silicosis, are typically characterized by a lengthy latency period, and consequently, a lengthy temporal separation between the alleged tortious conduct and the appearance of injury. In Cole v. Celotex Corporation, 599 So.2d 1058, 1065 (La.1992), this court adopted the significant exposure theory for purposes of establishing the applicable trigger for insurance coverage. Following that decision, our courts of appeal consistently held that the substantial exposure test is the appropriate means of determining the date of accrual of a cause of action resulting from long-term exposure to a substance such as silica, asbestos, or tobacco.[3]
In Ducre v. Mine Safety Appliances Company, 645 F.Supp. 708, 712-713 (E.D.La.1986), aff'd, 833 F.2d 588 (5th Cir. 1987), injured employees filed suit for damages arising out of exposure to silica dust over a period of many years. The court rejected the insurance company's attempt to telescope coverage into one policy period and held that liability would be prorated on a yearly basis. Under such an approach, each insurance company would be on the risk for each plaintiff asserting a claim, for each policy period that the plaintiff was exposed to silica dust. Ducre, 645 F.Supp. at 712-713. The court further determined that this allocation would be carried out by dividing the amount of the judgment by the total number of years of a plaintiff's exposure to obtain a judgment amount per year. Ducre, 645 F.Supp. at 714.
In Norfolk Southern Corporation, 02-0369 at 2, 859 So.2d at 172, the insured (Norfolk) and several affiliated railroad companies brought an action against several excess insurers for declaratory judgment on coverage for pollution. The court recognized that Louisiana uses proration to allocate coverage in long latency industrial disease cases, and likewise calculated proration in that environmental pollution case. The court stated there is no relevant distinction between the cumulative nature of the bodily injuries in long-latency occupational diseases and that of property damage in long-term environmental contamination.
The court further held that this liability should be allocated on a pro rata basis over all periods in which contaminating activities took place, including those in which Norfolk was uninsured. The court explained:
Underlying the holdings in the Louisiana cases addressing allocation in long-term losses spanning multiple policy periods is the concept that insurers may limit their liability to discrete and finite periods. The exposure theory, upon which the Louisiana allocation approach is based, relies on the principle that an insurer will only be responsible within the terms of its policy for those damages *466 arising out of the period the policy is in effect. In short, each insurer is responsible, up to the limits of its policy, for all damages emanating from occurrences taking place during the insurer's policy period. All damages emanating from occurrences taking place outside the policy period are covered by [other] insurers on the risk at the time[s] the occurrence[s] took place.
Norfolk Southern Corporation, 02-0369 at 42-43, 859 So.2d at 198. The court further held that to the extent Norfolk's claims arose out of occurrences taking place during a period in which no insurer was on the risk, the logical approach was to treat Norfolk as self-insured for that period and assign it a pro rata share.
Thus, in the instant case, the trial court's judgment ordered the solvent insurers to "fill the gap." However, this finding was contrary to the proration of insurance coverage that is a component of the significant exposure test in long latency disease cases. In reversing that judgment, the court of appeal found that retroactive application of the amendment to LSA-R.S. 22:1386(A) to Southern Silica was unconstitutional. The court of appeal was correct in reversing the trial court's judgment, but as we will explain, the reversal was for the wrong reasons.
This court performs a de novo review of a judgment declaring a statute unconstitutional. State v. All Property and Casualty Insurance Carriers Authorized and Licensed to do Business in State, 06-2030, p. 6 (La.8/25/06), 937 So.2d 313, 319. In conjunction with this review, certain principles apply. As a general rule, statutes are presumed to be constitutional; therefore, the party challenging the validity of a statute has the burden of proving its unconstitutionality. State v. Citizen, 04-1841, p. 11 (La.4/1/05), 898 So.2d 325, 334. Because the provisions of the Louisiana Constitution are not grants of power, but instead are limitations on the otherwise plenary power of the people, exercised through the legislature, the legislature may enact any legislation that the constitution does not prohibit. Louisiana Municipal Association v. State, 04-0227, p. 45, 893 So.2d 809, 842-843. As a result, a party challenging the constitutionality of a statute must point to a particular provision of the constitution that would prohibit the enactment of the statute, and must demonstrate clearly and convincingly that it was the constitutional aim of that provision to deny the legislature the power to enact the statute in question. World Trade Center Taxing District v. All Taxpayers, Property Owners, 05-0374, p. 12 (La.6/29/05), 908 So.2d 623, 632. A constitutional limitation on the legislative power may be either express or implied. World Trade Center Taxing District, 05-0374 at 12, 908 So.2d at 632.
Finally, the most pertinent principle applicable to the instant case is that because legislative acts are presumed to be within the legislature's constitutional authority, this court must construe a statute so as to preserve its constitutionality when it is reasonable to do so. State v. Fleury, 01-0871, p. 5 (La.10/16/01), 799 So.2d 468, 472; Moore v. Roemer, 567 So.2d 75, 78 (La.1990). In other words, if a statute is susceptible of two constructions, one of which would render it unconstitutional, or raise grave constitutional questions, the court will adopt the interpretation of the statute which, without doing violence to its language, will maintain its constitutionality. Hondroulis v. Schuhmacher, 553 So.2d 398, 416-417 (La.1988).
The trial court's reasons for granting LIGA's motion for summary judgment and the appellate court's opinion reveal that neither lower court considered whether *467 the provisions of Act 108 could be interpreted to maintain its constitutionality. Without any reference to the wording of the statute, the trial court stated that the amendment to LSA-R.S. 22:1386 "requires the other insurance companies to fill in the gap left by the insolvency of Reliance." The judgment specified that Southern Silica could claim defense and indemnity, "but only after all other insurance coverage available to [the insured] for any and all coverage periods has been fully exhausted." The concurring appellate court judge agreed with the trial court that each of the solvent insurers would share the cost of coverage for the Reliance years because they contracted for coverage during their policy years up to the monetary limits of their respective policies. The concurring judge did not view this requirement as an impairment of the contracts between Southern Silica and the solvent insurers.
However, the majority of the appellate court panel found an impairment of contract because the legislature was requiring Southern Silica to now assert their claims for defense and indemnity, not against LIGA for the Reliance years, but against their solvent insurers, that provided insurance from as early as 1965 to as recent as 2003. Thus, Southern Silica would be making demands for coverage for a period where the solvent insurers had no contracts in effect and did not receive premiums during this period.
Given our reading of the statute, it is unnecessary for us to address the constitutional issues decided by the court of appeal.
The first sentence of Section A of R.S. 22:1386 provides: "Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer which is also a covered claim, shall be required first to exhaust his rights under such policy. . . . [A]ny amount payable by such other insurance shall act as a credit against the damages of the claimant, and the association shall not be liable for such portion of the damages of the claimant."
This provision survived scrutiny for constitutional infirmities by this court in Segura v. Frank, 93-1271 (La.1/14/94), 630 So.2d 714. That case involved actions that had been brought to contest the retroactive application of amendments requiring insureds to exhaust their uninsured motorist (UM) coverage before proceeding against LIGA if the tortfeasor's liability insurer was declared insolvent. This court held that retroactive application of the amendment that contained a retroactivity provision would not unconstitutionally impair the UM insurers' contractual obligations because the amendment had a significant and legitimate public purpose that justified the impairment, i.e., the prevention of depletion of LIGA funds. Id., 93-1271 at 25-26, 630 So.2d at 732.
Application of this same provision was urged by LIGA in Hall v. Zen-Noh Grain Corporation, supra, which was a toxic tort suit against a grain corporation seeking damages for injuries caused by the actions and operations of the defendant from 1975 forward. Zen-Noh filed a third-party demand against LIGA demanding LIGA be held liable by virtue of the insolvency of its primary insurer and its excess carrier from 1982 to 1984. The trial court maintained an exception of no cause of action filed by LIGA on the ground that under this provision an insured is statutorily required to exhaust all available coverage prior to instituting a claim against LIGA; the appellate court affirmed. This court reversed, holding Zen-Noh had clearly alleged that it did not have a claim against an insurer (other than the insolvent insurers) under any provision in an insurance *468 policy in effect during the time period of the insolvent policies. Although Zen-Noh had filed third-party demands against other insurers, the record revealed these demands involved applicable policy periods that were outside the policy periods of the insolvent insurers. The existence and availability of the other, solvent insurers did not contradict Zen-Noh's allegation that it did not have a claim against an insurer under any provision in any insurance policy in effect during the insolvent insurers' policy periods.
Thus, this court has already held that the first sentence of LSA-R.S. 22:1386(A) cannot be extended to a long latency industrial disease case in which proration among the years of exposure is the rule. The distinction between Segura and Zen-Noh is obvious. The UM carrier in Segura, a typical tort case, had entered into a contract with its insured to provide coverage for a discrete period of time, up to the policy's monetary limits; the tort occurred during that period of time. However in Zen-Noh, toxic exposure occurred during years when the solvent insurers' policies did not provide coverage. According to the exposure theory and its component pro rata share allocation, coverage for exposure outside the policy period could not be demanded of the solvent insurers.
In the instant case, LIGA has argued that the amendment to LSA-R.S. 22:1386(A) has legislatively overruled Zen-Noh. We disagree.
There is nothing in the added provision that would require "filling the gap" left by the insolvency of Reliance. The operative wording is:
In the case of a claimant alleging personal injury or death caused by exposure to . . . or contamination from any environmental pollutant or contaminant, such claimant must first exhaust any and all other insurance available to the insured for said claim for any policy period for which insurance is available before recovering from the association, even if an insolvent insurer provided the only coverage for one or more policy periods of the alleged exposure. [Emphasis supplied.]
The above provision merely states the order in which a claim must be handled. The claimant must "first" collect other insurance "available to the insured" before the claimant can collect from LIGA. What is "available" is the pro rata share of each insurer for each year that insurer was on the risk. Thus, the amendment provides a procedure for asserting a claim against LIGA: the claimant must "exhaust" the other solvent insurers' pro rata shares of his or her damages before asserting a claim against LIGA to pay Reliance's pro rata shares.[4] This reading of the amended *469 statute comports with Louisiana's use of the significant exposure theory in long latency disease cases and its component, proration of insurance coverage. Even if the monetary limits of each policy is far in excess of the prorated share, there is no authority in the legislation for the courts to assess an insurer with an amount in excess of the prorated amount of the claimant's damages, as would be necessary if the insurer were to "fill the gap" of the Reliance years.
More importantly, this reading comports with the proper principle of constitutional scrutiny, the presumption that the legislation is constitutional. We hold that the court of appeal could have avoided its declaration of unconstitutionality by merely interpreting the plain language of the statute, the effect of which is to merely put LIGA at the end of the chain of recovery by the claimant.
Because the legislature specifically provided that this statute is to be applied to all pending claims and because our reading of the statute finds no constitutional infirmities, retroactive application of the statute is not prohibited. See Segura, 93-1271 at 8, 630 So.2d at 721.

DECREE
The judgments of the lower courts are reversed. This court decrees that Southern Silica is entitled to indemnity for the years 1977 through 1982 from LIGA, but only after the pro rata shares of all insurers that provided coverage in the Louisiana suits against Southern Silica are determined by judgment or settlement. Because LIGA also owes Southern Silica a defense for the 1977-1982 time period, indemnification for defense costs borne by Southern Silica can be recovered from LIGA upon proper proof thereof.
REVERSED AND RENDERED.
KNOLL, J., concurs in result.
NOTES
[1] This constitutional provision provides, in pertinent part: "a case shall be appealable to the supreme court if . . . a law or ordinance has been declared unconstitutional."
[2] The record reveals the breakdown of the 489 pending suits to be: 28 in Louisiana, 276 in Texas, and 185 in Mississippi. Although Southern Silica asserts they have paid out a total of $115,964 for what would have been Reliance's share in 34 settled suits, the record reveals only the following settlements were in Louisiana suits: suit No. 2, $479.10; suit No. 3, $12,833.34; and suit No. 4, $2,175.83, for a total of $15,488.27.
[3] See Abadie v. Metropolitan Life Insurance Company, 00-344 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, writs denied, 01-1543, 01-1544, 01-1629 (La.12/14/01), 804 So.2d 643; Callaway v. Anco Insulation, Inc., 98-0397 (La. App. 4 Cir. 3/25/98), 714 So.2d 730, 731, writ denied, 98-1034 (La.11/19/99), 749 So.2d 666; Pitre v. GAF Corporation, 97-1024 (La.App. 1 Cir. 12/29/97), 705 So.2d 1149, 1156, writ denied. 98-0723 (La. 11/19/99), 749 So.2d 666; Young v. E.D. Bullard Company, 97-657 (La.App. 5 Cir. 11/25/97), 703 So.2d 783, 784-785, writ denied, 98-0457 (La. 11/19/99), 749 So.2d 665; Thomas v. Armstrong World Industries, Inc., 95-2222 (La.App. 1 Cir. 6/28/96), 676 So.2d 1185, 1186, writ denied, 96-1965 (La.11/1/96), 681 So.2d 1272.
[4] Using hypothetical figures will illustrate the different results that would occur if LIGA's reading of the statute were used instead of the pro rata allocation that is used in Louisiana. LIGA asserts the policy limits of all solvent insurers must be exhausted before LIGA becomes obligated to assume liability for Reliance's pro rata share.

Let us assume that a silicosis claimant has a work history with Southern Silica of 19 years, and that for each of those years Southern Silica had insurance coverage of $1,000,000  14 years with solvent insurers and 5 years with the now insolvent Reliance. Using LIGA's proposed reading of the statute, the silicosis claimant would have to prove damages in excess of $14,000,000 (the aggregate coverage provided by the solvent insurers) before the claimant could recover from LIGA for Reliance coverage. Obviously, LIGA would seldom, if ever, be called upon to pay anything to the claimant.
However, let us assume a silicosis claimant with a work history of 19 years can prove damages amounting to $1,900,000. Under the pro rata allocation method, the claimant must recover $1,400,000 from the solvent insurers before proceeding against LIGA to recover the $500,000 prorated for the 5 Reliance years. In order for the claimant to be compensated for all of his damages, LIGA will have to pay the pro rata share allocated to the Reliance years.
In effect, LIGA's reading of the statute would result in shielding LIGA from liability in long latency toxic tort cases. Thus, the risk of insolvency would be borne by the handful of insurers that wrote policies for Southern Silica instead of being borne by the entire Louisiana insurance industry, as was intended when LIGA was created by the legislature.